My name is Deanne Maynard, and I represent Defendant Appellant Nuvasiv, and I'd like to reserve five minutes of time for rebuttal. The district court fundamentally misapplied basic trademark law, resulting in a litany of highly prejudicial errors that culminated in a $60 million verdict and the cancellation of Nuvasiv's federal trademark registrations. Among the many errors, the district court made three legal errors related to use. First, the district court wrongly believed that prior use alone was enough to establish trademark rights, but NNP had to prove that they continued to use the same mark on the same goods until the time of trial. Second, the district court wrongly believed that prior use was enough to establish nationwide rights, and so therefore he didn't require the jury to find where, if anywhere, NNP had adequately penetrated the marketplace to establish trademark rights. And finally, the district court wrongly believed that use had to be disclosed to the trademark office, and failure to do so was fraud, and so therefore did not require the jury to find that the declarants had a subjective belief that NNP had clearly established rights superior to Nuvasiv's. And all of these errors, among others, culminated in the $60 million verdict, which is contrary to law, because under the statute, trademark verdicts are to be compensatory and not punitive, and under this Court's law can't be a windfall, which here it certainly is, where NNP, in its most profitable year ever, only made $220,000, and now they've been awarded $60 million. I mean, this isn't a case where every product Nuvasiv sold would have been sold by NNP. It isn't a knockoff case. It's just a name. So if I could start with the first legal error, because the first legal error about use requires judgment as a matter of law for Nuvasiv on the trademark infringement claim, and then that also sets aside the damages number. NNP discontinued use of the Neurovision SE mark in 2007. Dr. Ray so conceded at trial. Since that time, they've labeled their product with a different mark. They changed the mark to Nerviana. Their only basis here in this Court to claim continued use is their use of Neurovision, the word Neurovision, in a totally different mark, the company name, Neurovision Medical Products. That, as a legal matter under this Court's precedent, is not continued use of the different mark, Neurovision SE. Mr. Counsel, I've looked at the cases that were cited, and they're very interesting. The movie buff case, I think, is a particularly interesting example. But Neurovision is not exactly like putting together the words movie buff, both of which are good English words, commonly used, put together to describe a concept. Neurovision is much more like Xerox. It's a unique, it's a made-up word. And so it's more identifiable. If somebody said, I'm Xerox buff, and then somebody else copied that, you would say, well, wait a minute, why are you taking Xerox's name? It's not like you've been using, you know, Harvard or Cambridge in your name, things that evoke warm, fuzzy feelings in our intellectual centers but are commonly used. Neurovision's a made-up word. So if they're still using Neurovision, doesn't that show, even if they're using it with a different word behind it? No, Your Honor. For two reasons. One, just to, about your point about the Brookfield case, the Brookfield case, another part of the decision says movie buff is a made-up word, and it doesn't appear in the dictionary. So to the extent one's going to draw an analogy, I think the analogy is still apt here. But more importantly, as a legal matter, the standard for tacking is extremely strict, as the Court says. The marks have to be virtually identical. And in one industry, as this Court noted, the only case it could find where tacking had been allowed is where someone had added an apostrophe to the word has. And so in other circuits, the standard is the same. So, for example, in Van Dien-Krati, the Federal Circuit, which has a lot of experience with trademark law, says that both marks have to be considered in their entirety, and it expressly rejects the notion that you look only at the strong words, which I think is the question that you're asking. That's not the test. For tacking, what you look at is the mark in its entirety. And ILCO, which is a case from a predecessor to the Federal Circuit, so is also binding law in the Federal Circuit, says that at the same point. You don't just look at the distinguishing feature. And so it is true, for tacking purposes, they can't claim continued use of NeuroVision. Even if one thinks that NeuroVision, standing alone, was the mark that they previously used, that's not sufficient. They can't tack their current use of a different mark, NeuroVision Medical Products, which is added words to it. It's not the same mark when you look at it as a whole, in order to claim continued use. And that lack of continued use disposes of their trademark infringement claim. They have no trademark infringement claim. It also disposes of the damages claim here, which was based solely on the trademark infringement claim, because the only claim they made was one for lost profits, which one, under the statute, you have to make as a trademark infringement matter. So if the Court were to find that their discontinuance, as I think the Court should, is clear on this record, no reasonable juror could have concluded they continued to use the mark. That entitles NeuroVision to judgment as a matter of law and outright reversal. Is it required that they continue to use the mark on the very product that's at issue, the spinal device, or can they use the mark on another device? In order to continue use, Your Honor, as a legal matter, they have to continue the exact same mark on the same product. Now, the spinal monitor, just so the record's clear, the spinal monitor, the monitor used by spine surgeons is my client's product. Oh, okay. Uvasive. So theirs is for, what, palm? Ear, nose and throat. Ear, nose and throat, Your Honor. Okay. All right. And so that is an important point, too, and the district court continually cut off our attempts to prove the difference between our products, which would have been highly relevant both for the sleep craft factors. Well, right. And it seems like he didn't consider the whole likelihood of confusion issue properly given that they were different products and different markets. And I'm not sure you even got all that evidence in. We didn't, Your Honor. In fact, that's another separate claim of ours, which he completely and sua sponte repeatedly cut off our efforts saying this is not a patent case, this is not a patent case, this is trademark, this is just about a name. But that misses the fundamental point about trademark. Trademark is not just about a name. It's about a name in association with a particular product. And so it could very well be that one can use the same name on one product and someone else can use the same name on a different product and both people can have their marks exist simultaneously. But you need not get to the sleep craft problem if you find, as I think you should, that there's not continuous use here. I don't know if we can really find that because it seems like it is a question for the jury. Or is it undisputed that they stopped using the mark in connection with the ear, nose and throat nerve spotter? They testify. Dr. Ray, who's the inventor of their machine, conceded that since 2007 it marks its product with a different name, Nerviana. And this is in the excerpts at record 125 and 129 to 130. So the fact that they mark their products with a different name is conceded. They have changed their product name. And their briefing here relies on the use, their current use of their company name, Neurovision Medical Products. So turning to the fraud on the PTO claim, the judge made a similar legal error with respect to use. It's quite clear in this court that every known use need not be disclosed to the trademark office. That's also the law in most other circuits. So yet, nevertheless, the district judge here instructed the jury and allowed them to find fraud based on the wrong falsity. The judge told the jury that the trademark law requires disclosure of use. And we know that caused prejudice here, because the jury in its deliberations sent out a note to the judge. Your Honor, we're trying to find where on the trademark application it requires disclosure of prior use. And over our objection, the judge responded, quote, the law of trademark requires disclosure of prior use at ER 56. And then went on to say to us, to counsel, we'll see if that is the law or not the law. Well, that has not, that is not the law. It wasn't the law when he said it. It has not been the law. We cited to him recent authority from this court, Hanna Financial, that held that wasn't the law right before he told the jury that was the law. And so that infects the entire – I mean, I recognize you usually give some deference to jury's findings, but here where they're given the completely wrong legal framework in which to decide the questions, you really can't give them any deference here. They were told that the wrong falsity was fraud. They were not told that the declarants had to have a specific intent to mislead the patent office. And so those two things together require setting aside the fraud verdict, at least a new trial on the fraud claim, although there's really inadequate evidence on the record here that anyone at Nuvasiv had knowledge of their clearly established rights. Well, I'm a little concerned about the evidence that where the vice president of Nuvasiv submitted the Section 510K form to the FDA to expedite the product, its product approval, and described the product as substantially equivalent to the NeuroVision SE. So it shows some knowledge about the product and the use of the name in connection with an application to the FDA. And then moves forward and files with the incontestability before the patent office later. It seems somewhat at odds. Different people made those filings. I know, but aren't they all attributable to the corporation because the corporation is the one who is claiming the right to the mark? The oath, the declaration, requires the trademark oath, requires to the best of the verifier's knowledge and belief, no other person has the right. And courts that look at that look at the declarant's belief. But the court need not decide that question in order to reverse here, because the judge still told the jury, even if you ---- I understand it. I understand why I think that this is a question of fact. It's not something we can say. At a minimum, new trial would be required. So they do point to evidence that there were some people within the company who knew of the name NeuroVision on a different product. But that ---- It actually seemed like many people were using the name NeuroVision. In the United States? Yes. Yes, Your Honor. And that's common in trademark. And it's also ---- it's important to understand that it's not a falsity or fraud on the patent office to check the box that you don't believe anyone else has clearly established rights if what you mean is in this space. So we were applying for a trademark in this fine space. And it isn't true that every time you turn out to be wrong and you subsequently might lose a case on likelihood of confusion later, that that means you lied beforehand. I mean, it means ---- so the standard for setting aside for fraud on the patent office is much tougher than the standard for ultimate likelihood of confusion of the two marks. So at a minimum, Your Honor, even if one thinks that some people in the company did know of the name, at a minimum, a new trial would be required because the jury was improperly instructed. If the Court doesn't set aside a liability ruling, there are a number of problems with the monetary award as well. The judge excluded our expert evidence on the very point on which the law gives us the burden of proof, which is to prove the cost and the amount that's ---- of our profits that's not attributable to the name. So he excluded not only, as we were discussing earlier, Your Honor, not only did he testify that with this medical product, and in his expert report is in the record in and around ER 499, he was going to testify that with this kind of medical product and the kind of support that you give with it and the kind of advice that you give with it and the kind of instructions that you give with it, then it's the way that it works is the reason fine surgeons would buy it, not because of what you call it. And the only thing that they are entitled to would be any profits that Nuvasiv has that are attributable to what we've called it. But their product does something entirely different, and what we've called this medical device has very little to do with anybody's decision to purchase it. And our expert would have testified that in his opinion only 2 percent of any profits would have been attributable to the name, yet the judge wouldn't let us put that  in. And it wasn't an abusive discretion standard that should apply to that decision because he erred as a matter of law in concluding that this report was not a proper rebuttal report. So can you address your request for reassignment? What is that based on to another judge? Your Honor, there are two reasons, I think, for reassignment here. Under this Court's case law, you will reassign if a judge has continually expressed an erroneous view, an adamantly held view, that suggests that they will not be able to set that side on remand. And I think that is clearly met here. Repeatedly throughout the trial, despite our citation of this Court's decisions that are clearly on point and clearly hold otherwise, he continued to rule contrary to this Court's decisions. And secondly, then, he continually shut down our client's attempt to defend itself with derogatory remarks of my client's trial counsel. Were you trial counsel? Who was trial counsel? My partner, Arturo Gonzalez, was trial counsel. And he repeatedly by name said, Mr. Gonzalez this, Mr. Gonzalez that, and shut him down in a derogatory way. This is not a patent case. The jury can read, Mr. Gonzalez. Are we going to really go on for pages and pages? This is not a patent case in ways that were both legally mistaken and then very personal to the lawyer representing my client before. And so, yes, Your Honor, we would ask that if you do find the need to remand, that you would send it back to someone else. I'd like to reserve the balance of my time. Good morning. Peter Ross for NeuroVision Medical Products. I'd like to start out talking about the trial court's decision to cancel Nuvasiv's trademark registrations. Because if that decision is upheld, a whole number of interesting consequences follow. The decision whether or not to cancel the trademark is by statute solely one for the court. The jury instructions are not relevant. It's the judge's determination. And this Court reviews the trial court's decision solely for abuse of discretion. And here, there was no abuse of discretion. To understand the fraud, I think it's necessary to understand two facts that give this case context. Well, counsel, if, in fact, the judge has got a misapprehension as to the law, I think there are cases that hold that that is an abuse of discretion. That can be. But there is no evidence here before this Court that the judge had a misapprehension of the law at the time. On any points? Not on the fraud, certainly, at the time he made the decision. The other side submitted a brief explaining the law. We submitted a brief explaining the law. The judge looked at those briefs and concluded that he found the fraud standard was met. And, in fact, here, the evidence of the fraud was overwhelming. And I think if I could take just two minutes, I could make that clear to this Court. The two contextual facts are that Dr. Ray was the leading figure in the medical industry on nerve location technology. He'd come up with a very clever device that worked like the backup beepers on an automobile. When the knife gets close to a nerve, the machine starts beeping faster and faster, warning the surgeon. And Dr. Ray crisscrosses the country. He's lecturing at hospitals, conventions, trade shows, conducting clinical studies, publishing articles in learned journals, calling on doctors in hospitals, and acquainting everyone with his neurovision device. He's not some crackpot toiling away in obscurity. He's the leading figure. Second contextual fact is that Nuvasiv's entire business plan. Roberts. Counsel, before you get on that, he does appear to have had a very innovative idea, but it doesn't appear that it really caught on if you look at the number of sales of these machines. He loaned them out. He went to a lot of places. And it looks like there may have been some glitches in the way that it actually operated and that people didn't like it. How many of these machines did he actually sell? He sold, I believe, one or two. But to put that in context, that wasn't the business model. The way these machines work is you lend the machine and you sell people the electrodes. The electrodes aren't that expensive, but he's selling millions of dollars' worth of To show exactly how that worked, Nuvasiv. What was the price of the sales on the electrodes? I don't have the exact figure. So that's not in the record? It must be in the record. Do you have any idea what the profitability was? Of the electrodes? Year by year for the company. We got the figure $200,000 from the other side was your best year. Do you dispute that? No, I don't dispute that. Okay, so your best year was $200,000 and that would be the electrodes, machines, everything. Yes. To put that in context, counsel, I have to say that doesn't sound like very much. Okay. Especially when you've got a $60 million verdict. I understand what the court is saying. But to put it in context, Nuvasiv had $203 million worth of sales and they sold 20 machines. They were doing the exact same thing we're doing. They're lending them out and they're selling a whole lot of electrodes. And that's how they made their profit. And to understand exactly why that figure, the damage figure, is appropriate, I'd like to talk about this second contextual fact, which is that Nuvasiv's entire business model depended on this new nerve location technology. They smartly realized that the wave of the future for surgery is minimally invasive surgery. We can operate on one's heart or one's uterus or knee through a tiny hole. But we couldn't do that with back surgery because of the danger of cutting nerves. So what Nuvasiv did is they recognized that this new nerve location technology could be used to punch a tiny little hole through the muscle and convert back surgery into minimally invasive surgery. So this was a very, very important part. Their whole business model depended on it. So here's the evidence of the fraud. Nuvasiv is a startup company. They have zero products and zero dollars in sales. Before you go there, the question of fraud, though, is a question in fact for the jury, right? Well, this was a question for the judge. No, it's not. Under all the case law, the leading treatise, it's a question in fact for the jury, right? It would be. Did he instruct the jury on this? He did. And there was an advisory opinion from the jury. But no one sought fraud damages. It's a question for the jury if we were getting fraud damages. The court orders cancellation based on a finding of fraud by the jury. The court orders cancellation based on its own finding of fraud. I don't think that's right. Well, that's exactly what the statute provides. The court has to determine whether or not to cancel these marks. What's the language in the statute? The language I'm focusing on is just that it's the court's statute. Which statute? The 1065. Can you quote it? So the court has plenty of evidence, and the court does say expressly that the jury found fraud, and I agree with that determination. The court was making its own determination as it was required to do. Was the jury properly instructed on the prior use question? The – I think as in an overall basis that the jury instructions were proper and that justice was served here on an overall basis. But if – What does that statement mean? Was the jury properly instructed on the question of the prior right as opposed to simply prior use? On prior right versus – Right, right. The statute – the statute, it requires disclosure of knowledge of someone's prior rights to use the mark, not prior use. I understand what the court is saying now, it is asking. And in my view, within the context of the facts of this case, the instructions were proper on an overall basis. Beyond the instructions, I'm looking at question four on the jury ballot. Did defendant fraudulently conceal that it knew of plaintiff's prior use? That doesn't seem to be what the statute says. That's not what 1051a3d says. It asks whether a person has the right to use. That's different from prior use. So it doesn't even look like the question that's put to the jury, much less the instructions, but the question they were asking, yes or no, doesn't look like it's been properly formulated. Well, I don't believe there was an objection to that question going into the jury. Well, it may be plain error, counsel, if there was not an objection. But I think there probably was an objection. In any event, the decision, in my view, was one for the court, not the jury. Okay. But if the court has formulated the question wrongly for the jury, wouldn't that be the best evidence that the court didn't understand what the law required? Well, the jury, the verdict form was submitted by the parties and argued. And I don't recollect that there was an objection to the form of that question. So in that case, it would be an invited error if it were an error. And then what we have here is a situation where there are a handful of executives in Nuvasiv's company. One Nuvasiv executive, Corbett Stone, contacts Dr. Ray and attends a sales pitch meeting with Dr. Ray's son. The Nuvasiv engineering staff, including O'Brien Kelleher, acting under Corbett Stone's direction, borrows Dr. Ray's neurovision machine and conducts animal testing. Another Nuvasiv executive, Steve Reitzler, is in charge of seeking approval from the FDA. And he says, please approve us because our machine is just like Dr. Ray's neurovision machine. Their in-house counselor, Spangler, does a trademark search and finds neurovision.com, a website affiliated with an address and a phone number for Dr. Ray. Board member Lakob gets a business plan from Dr. Ray for his neurovision machine. And Simmons, another Nuvasiv executive, says he ran the neurovision name by everyone on the management team. Stone, Kelleher, and Reitzler don't say, well, we didn't bring up Dr. Ray and his neurovision machine. They say, we don't remember what we said. And the guy who signed the first declaration with the PTO, the Patent and Trademark Office, was at the meetings. He's there by name listed among the attendees. Clearly an inference can be made that the declaration was fraudulent. The trial judge's decision to cancel the marks is the evidence of intent to deceive the Patent Office. And was the jury instructed that they had to find that? The evidence of intent was the fact that Dr. Ray is a leading figure in this new field of nerve location. It's the heart of their business plan. Everyone's looking at Dr. Ray. They're borrowing a machine from him to do animal testing. They're looking at demonstrations with him. They're comparing their machine to his neurovision machine to get registration. Everyone's at the same small meetings. And it's impossible to believe that they didn't understand that this guy who is the leading figure in the industry. What was the evidence that they intended to deceive the Patent Office as to someone's prior right? Because they well know about Dr. Ray's machine. His right to the mark? I mean, the machine is something different than his right to the mark. Well, I guess the machine has the mark right on it. And they use the name neurovision in their applications to the FDA. I don't even know if you've established prior right to use the mark if you've only sold one or two. Well, what we did is we established that we marketed this all over the country. And it was used all over the country. So how many of these machines were out, had been loaned out? They were lent out, I think, at about 20 at a time, at any single time. Did the electrodes have the word neurovision on them any place? Or did they have anything in their literature that said only to be used with the neurovision SE? They didn't have the word neurovision on the electrodes. And the testimony trial was you couldn't print it on the electrodes. Was it in the literature? It was in the literature that accompanied every electrode sale. Where were the 20 machines? What parts of the country? Well, there was a pin chart that was created that showed prior use in 25 states. And that was a summary of the documentary evidence, invoices, letters, programs for lectures. If there are only 20 machines on loan, how could they be in 25 states? Well, because this was over a 10, we were doing this for 10 years before they ever started in business. So the machines were migrating from state to state. From state to state. And that pin chart is just a summary of the documentary evidence. Dr. Ray testified that he spoke to over 1,000 doctors and hospitals about his neurovision device. He gave 200 to 250 trial demonstrations at various hospitals and clinics. And he performed over 600 surgeries with his partners, showing people the use of his neurovision machine. It was all over the country, and it was before this device was ever used by Nuvasive or the name was ever used by Nuvasiv. On the other hand, Nuvasiv, with all its sales of electrodes and its lending out a far greater number of machines for the more popular back surgeries, proved prior use nowhere in the country. There's no evidence that they ever used the name in any state before we did. Now, how can you show continuous use if you changed the name in 2007 to Nervara? Is that what you changed it to? Let me start out by saying that the neurovision SE machines were not taken out of circulation. The evidence at trial was we continued to use those machines through the date of trial. With new machines that we made, we stamped Nervana, I guess, on the front, and neurovision medical products on the back of the machine. The machine and the electrodes were all continually sent and were sold with literature that described the neurovision system as including the machine, the electrodes, the cutting implements, and everything that was needed to use this neurovision system. And their neurovision was always used by itself. What happened here is analogous, in my view, to the following. We manufacture one car, we call it the Ford Model A. Then we name the whole company the Ford Motor Company, and every car has Ford Motor Company stamped on it. It's not discontinuing use of the mark. It's expanding use of the mark. And here's an interesting thought on that subject, that if the model number SE is considered to be part of the mark, which the Brookfield case seems to indicate it would not be, then Nuvasiv actually never used its registered mark. They registered the mark neurovision, but they used neurovision JJB. So if their argument were accepted, then Nuvasiv's registration would be subject to cancellation for non-use, since they never used the mark. Judge Bybee, to get to what I understand your Honor's issue to be concerning, their $60 million in profits versus our smaller profits and gain plan, I would liken it to this example. Some crazy guy uses a waffle iron to make soles for running shoes, and they become very popular, and he puts a little swoosh on those running shoes. But it's only among a very small group of the populace that happens to do long-distance cross-country running. It turns out that the greatest use of that little swoosh mark is on a whole line of athletic equipment that Nike successfully sells, and it turns into a multibillion-dollar company. Here Dr. Ray was using his mark, neurovision, in exactly the way Nuvasiv was using it for the nerve location technology, but for a very small specialty in the medical profession. It was the head and neck surgery, and their object was to avoid the facial nerve and the recurrent laryngeal nerve. Using that device for back surgery turned out to be the equivalent of putting the Nike swoosh on clothing and other athletic apparel. That was the market where a huge profit could be made. But because Dr. Ray is a little guy and has a little business he was a nose and throat specialist, right? Yeah. He wasn't going to go in and do back surgery, was he? Actually, his device, and there was evidence of this in the record, had been used in back surgery. Did he have a patent on the device? He had a patent on the electrodes. They came up with different electrodes. He hasn't alleged here that they're in violation of the patent on his process. No. So this is really quite different. This is your Waffle Soul example. The guy for the Waffle Souls claiming not that Nike's making Waffle Souls, but that he's entitled for getting profits for all of the shirts that they're making and for the batting helmets that they're making and bats. Under trademark law, all we have to do is prove the profits they earned from use of the mark if there's likelihood of confusion. We proved likelihood of confusion because their own records show that they're writing e-mails saying we're getting calls for all kinds of people who want head and neck surgery, and we don't even do that. That's not sufficient. I mean, he didn't include evidence. He excluded evidence on the sleep craft factors, which they have to be considered. That's one aspect is the evidence of the actual confusion. That's not the end of the inquiry. May I answer that question? Yes, of course you may. Okay. On the sleep craft factors and that evidence, that's reviewed for abuse of discretion. And I think that I know that all that evidence was cumulative in the record. It was indisputably in the record that Neurovision Medical marketed mainly to head and neck surgeons. It was indisputably in the record that Nuvasiv marketed primarily to back surgeons. It was indisputably in the record that doctors are sophisticated. Everyone understood these points, and they were argued to the jury by the defense. The only thing that happened is that the judge said, you know, we've heard this. Let's move on. And was that an abuse of discretion? I think not. I think that was a common instruction based on the evidence in the case. And with regard to the technology of the products, it would be, to return to my Ford example, it would be like me putting out a Ford automobile and then defending on the trademark, saying, well, my cars are fuel-injected as opposed to yours, which have a carburetor. The judge was, I think, making a reasonable decision, not abuse of discretion, saying that's not the inquiry. But in your Ford example, Ford is a recognizable mark, and people have come to associate, you know, high-quality cars over a long period of time. So if you put, if I went out and built a car and then stuck a Ford emblem on it, somebody's going to come along and buy it because it's a Ford. Now, is there any evidence here that somebody would have purchased NeuroVision's – I'm not NeuroVision's, I'm sorry, Nuvasiv's product because it said NeuroVision, not because it was a machine that really helped in back surgeries? I mean, it just didn't seem like your client's product had gotten sufficiently out there that anybody was going to mistake somebody else's product for that. Well, that was actually the jury's determination based on the totality of the circumstances, and there was plenty of evidence in the record of actual confusion, much greater than likelihood of confusion. But there was plenty of evidence, including their own memo saying, well, this is going to get confusing with two products that do the same thing with the same name, and they're getting calls for our products. So there's proof that customers that thought they were going to get us were actually calling their company looking for this head and neck product. This is one of those areas, like on the Internet, domain confusion, where as soon as they figure out that, oh, that company makes the spine and I'm looking for the ear, nose, and throat, it's over. It's like maybe a notion of initial confusion, but does it really prove that there's a likelihood of confusion such that one would purchase an invasive product instead of yours? Well, initial interest confusion is actionable. Only in the context of the Internet and domain names. I think that what happened here, actually, is they conducted their trademark search, which we know they did. They have zero dollars in sales. They're a startup. They note that Dr. Ray hasn't registered his trademark, so they just put the most recognizable trademark in the field on their product to get their company jump-started. They need to convince surgeons that we have a nerve-locating and avoidance device that will work, and they take the most recognized name in the industry and put it on their product with everyone's knowledge at those initial management meetings. All right. Thank you, counsel. Thank you. If I may just respond briefly. Judge Bidey, we did object to question number four on the verdict form at ER 258. Starting out with respect to question number four, we have several objections to that one. It goes on for several pages. Some of it is, you know, hits the very point that it needs to be, the jury needs to be asked whether the two individuals who signed the trademark application knew that the plaintiff had superior or clearly established rights in the NeuroVision SE mark, not merely prior use. Yet, of course, they weren't asked that, and they weren't told that was even relevant. We made similar objections to the jury instructions starting at ER 265 on the same point. With respect to NMP's sales, Your Honor, the number that I quoted, the $220,000 for their best year is available at ER 402, and the surrounding pages 386 to 405 will support the proposition that that was their best year. The record shows that they made only 35 of their machines total ever. There is no evidence as to where the machines were precisely loaned or to whom or for how long, other than vague testimony saying we loaned them. By comparison, how many machines did your client make? Your Honor, I think there may not be, this evidence may not be in the trial record, but it is in, I believe it is in the briefing with respect to the preliminary injunction. I think there's a number saying we've made 900 machines. And he's right that our business model is to loan the machine, but we sell many, many, many more products than just electrodes and not even that many electrodes. And Dr. Ray testified on the 35 machines, Your Honor. That's a fact that can be found at ER 87 to 88 and ER 128 to 129. As far as the map to which he refers, Dr. Ray conceded that nearly all the thumb tacks represent electrode-only customers. And even then, the map would show that there are no customers at all in 25 states and that in 15 additional states, there are fewer than three customers. So it's just, I think on this record, to pick up on a point you made, Your Honor, that one could find, no reasonable jury could find that they had clearly established rights for anyone to lie about. And that that would be a basis for judgment as a matter of law, but at a minimum, the errors and obstructions would require a new trial. The one point counsel made is all they're trying to do is expand their mark from NeuroVision to NeuroVision medical products. Brookfield says that's the one thing that we definitely know you can't do through tacking. You know, I would also like to note that we have a claim for latches here that I think is a very serious claim that the judge rejected on a legally erroneous basis. They knew for six years before they sued. If they had sued six years before they did, we would have been the unprofitable company that he has described us to be. And there's no way they would have gotten $60 million in damages. Latches should bar their ability to get any damages here. If Your Honor doesn't have any further questions. No. Thank you. Thank you. NeuroVision medical products versus invasive is submitted and will take up.
judges: Fletcher, Wardlaw, Bybee